CASE 11—PETITION EQUITY—JUNE 1.

## Struss v. Masonic Savings Bank.

| 89 | 61 |
|---|---|
| e111 | 360 |
| 89 | 61 |
| 129 | 185 |

APPEAL FROM LOUISVILLE CHANCERY COURT.

·SURETIES—CANCELLATION OF NOTE INDUCED BY FRAUD OF PRINCIPAL —SURETY RELEASED BY LACHES OF CREDITOR AFTER NOTICE OF FRAUD.—The cancellation of a note upon which a surety is bound does not have the effect to release the surety where the creditor was induced by the fraudulent representations of the principal obligor. to ·cancel the note; but the laches of the creditor, after he has notice of the fraud, or his release of any indemnity he has received, may have the effect to release the surety.

A debtor who was about to make an assignment for the bene- fit of his creditors, desiring to save his brother, who was his surety in a note, proposed to the payee of the note that if he would release the surety and extend the time for the payment of the note five years, he would have his wife secure the debt by a mortgage on her land, which both he and his wife represented was free from incum- brance. The creditor accepted this proposition, and a note payable in five years was executed, secured by a mortgage executed by the wife as agreed. The note upon which the brother was bound as surety ·was canceled in his presence. It was discovered by the creditor the

next day after this transaction that the legal title to the mortgaged land was in the husband, and also that it was incumbered to such an extent that it would satisfy but a small part of the mortgage debt; but, notwithstanding this discovery, the surety received no notice that the creditor would look to him for payment until this action was instituted about five months after the creditor had notice of the fraud, the creditor having, in the meantime, released the mortgage executed to him by the principal obligor and his wife. *Held*—That the surety is released by reason of the laches of the creditor after he had notice of the fraud, and also by reason of the release of the mortgage, which would have afforded the surety some indemnity after the satisfaction of prior incumbrances, for while the legal title was in the husband, he held it in equity for the wife; and the court will not inquire in such a case whether the surety could have obtained indemnity if it had not been for the laches of the creditor.

BROWN, HUMPHREY & DAVIE FOR APPELLANT.

1. The bank canceled the old note, on which the surety was bound, and took a new note, secured by mortgage on property of the debtor's wife; and the surety was shown the canceled note, and informed that he was released. The surety had nothing to do with any fraud in procuring this cancellation and release. The surety, thus released, cannot afterwards be held liable. (Carpenter v. King, 9 Met., 511.)

2. The bank learned, the next day, that the release had been fraudulently procured; but it held the new note and mortgage for five months, without notifying the surety, so that he could take steps to save himself. This was such laches, and such an election, as prevented the bank from afterwards claiming against the released surety. (Taylor v. Lohman, 74 Indiana, 421; Sneed v. White, 3 J. J. Mar., 525; Story's Eq. Jur., sec. 325; Brandt on Suretyship, sec. 384; Aaron v. Mendel, 78 Ky., 431; Kirby v. Taylor, 6 Johns. Chy.; Brooking v. Farmers' Bank, 83 Ky., 439.)

3. The bank having obtained a mortgage to secure the new note, it was its duty to preserve that mortgage, and turn it over to the surety, in case it should revive its claim against the surety. The bank released that mortgage, and, therefore, has precluded itself from claiming against the surety. (Woolley v. Lou. Banking Co., 81 Ky., 527; Hardcastle v. Rector, 2 Ky. Law Rep., 209; Blydenbergh v. Bingham, 38 N. Y., 371; Story's Eq. Jur., sec. 439.)

4. It is not necessary for the surety to prove that he could, in fact, have obtained indemnity if he had been promptly notified by the bank, or, if the bank had not released the mortgage. It is sufficient that he was given no opportunity to try to do so. (Bridgeford v. Burbank, 3 Ky. Law Rep., 99.)

P. A. GAERTNER OF COUNSEL ON SAME SIDE.

Struss v. Masonic Savings Bank.

HELM & BRUCE FOR APPELLEE IN PETITION FOR REHEARING.

Brief not in record.

1. It is incumbent on a surety, under appellant's circumstances, to show, in order to be released, that he has changed his position injuriously to himself, on the faith of the creditor's action. If he means to rely on a want of notice, within a reasonable time, as the cause of his loss, it is incumbent on him to plead it.

2. The principle that the surety, in order to be released, must show that he has suffered loss, is not varied by the delay of the creditor in giving notice to the surety. However great the delay, the inquiry still is, has the surety suffered a loss by reason of the action of the creditor? (Brandt on Suretyship, sec. 216; Gordon v. McCarty, 3 Wharton; Stratton v. McMakin, 84 Ky., 641; Farmers and Drovers' Ins. Co. v. German Ins. Co., 79 Ky.; Allen v. Sharp, 37 Ind., 37.)

3. Before the discovery of the fraud, the principal had made an assignment for the benefit of creditors, which preserved his estate in exactly the same condition it was when he perpetrated the fraud, and the estate has never yet been distributed. Therefore, the surety has lost nothing by the delay in giving him notice.

4. A person, induced to enter into a contract by fraud, cannot accept and avail himself of such parts of the contract as he likes, and are for his benefit, and reject the remainder. He has his election, either to accept or reject the *whole contract;* and the appellee, having elected to reject the whole contract, could not tender an assignment of the mortgage to the surety, as that would have been an act of ratification. (Kerr on Fraud and Mistake, p. 52; Bigelow on Fraud, pp. 808-9; Eddison on Contracts, vol. 1, p. 452; Wharton on Contracts, vol. 1, secs. 232a, 282, 290; Bispham's Principles of Equity, p. 260, sec. 204; Pomeroy's Equity Jurisprudence, sec. 915; Overton v. French, Sneed, 287; Turner v. Clay, 3 Bibb, 52; Johnston's Heirs v. Mitchell's Heirs, 1 Mar., 227; Collier v. Thompson, 2 Mon., 18; Durrett v. Simpson, 3 Mon., 525; Collier v. Thompson, 4 Mon., 85; Caldwell v. Caldwell, 1 J. J. Mar., 53; Camplin v. Burton, 2 J. J. Mar., 216; Edwards v. Hanna, 5 J. J. Mar., 25-27; Blackwell v. Oldham, 4 Dana, 196; Lacey's Heirs v. McMillen, 9 B. Mon., 525; Hahn & Trapp v. Trustees of Bellvue, 8 Ky. Law Rep., 696.)

JUDGE PRYOR DELIVERED THE OPINION OF THE COURT.

J. C. Struss and his brother, H. C. Struss, executed their joint note to the appellee, the Masonic Savings Bank, for four thousand four hundred and eighty-five

·dollars and eighty-five cents, J. C. Struss being the principal obligor, and his brother the surety.

The note had been overdue for some months when the principal, J. C. Struss, on the 13th of June, in the year 1887, had an interview with the president of the bank, in which he stated that he was on the eve of making an assignment of his property for the benefit of creditors, ·and being desirous to release his brother from all liability on the note, proposed to the president of the bank ·that if he would release him, and extend the payment of the note for five years, he would execute, or have executed, to the bank a mortgage on some real estate in the c;ty of Louisville belonging to his wife, that was free of incumbrance, and also on some land in the county of Jefferson that belonged to him. The property being amply sufficient, if free of liens, to pay the ·debt, the proposition of Struss was accepted, and a note, ·payable in five years, executed for five thousand dollars that satisfied the note upon which the brother was the ·surety, and some other small notes owing by J. C. Struss, and upon which there was no surety. The bank · consulted a lawyer with a view only of having a mortgage prepared, which was written and executed by Struss and his wife, and admitted to record. Both the husband and wife, as the proof conduces to show, represented the title as in the wife to the city property, and that no liens had been created upon it. The note upon which the brother was bound as the surety was ·delivered up and canceled.

On the next day after this transaction, J. C. Struss made an assignment for the benefit of his creditors, and ·on the next, or the same day, his assignee informed the

attorney who prepared the mortgage that the title to the city property was in the husband of Mrs. Struss, and that incumbrances had been created upon it for a considerable sum of money. The attorney at once informed the bank officers of the fraud practiced on the bank, and the note having been delivered up, this action in equity was instituted on the 17th of November, 1887, to have the transaction canceled, and to make H. C. Struss liable as surety on the note. The testimony of Struss and wife denying all fraud is in direct conflict with that of the officers of the bank and the attorney preparing the mortgage; but it is evident that the possession of the note was obtained by reason of these fraudulent representations already recited, and besides, the surety being perfectly solvent, it is unreasonable to suppose that the bank would have accepted other security unless satisfied the property mortgaged was sufficient to pay the debt, and this it would have done but for the liens of record already upon it.

The title to the property was originally in the wife of Struss, and she attempted, in order to pass the title, to execute to her husband a deed to the property, and being advised that the deed was void, it seems that the husband, after that time, purchased the property in his own name at a decretal sale in favor of one Gheens to satisfy a lien upon it, and the sale being confirmed, the title was in that condition when the mortgage to the bank was executed.

Liens existed at the time of record amounting to near five thousand dollars. So the fraud being clearly established, the only questions presented for consideration arise from the complaint of the surety on the note to

the bank, who has been compelled by the judgment below to pay the money.

The surety claims:

1. That the act of the bank in taking the mortgage and surrendering the note to the principal obligor suspended or deprived the surety of any remedy in law or equity for his protection.

2. That if the bank was defrauded as alleged, it had notice of the fraud on the next day after the transaction, and that good faith to the surety required the bank to inform him at once, or within a resonable time, that his liability still existed, and its failing to do so, in so far as he was concerned, was an election on the part of the bank to accept the mortgage as security.

3. That the mortgage, if intended to relieve him from responsibility, should not have been released by the bank, and that if the bank still looked to him for indemnity, he was entitled to all the securities obtained by the bank for the payment of the debt.

It is not alleged in the petition, or attempted to be shown by testimony, that H. C. Struss, the surety, was in any manner connected with the fraud of his brother, or that he knew the details of the transaction, or the purpose of the bank, until this suit was instituted against him to cancel the mortgage and hold him liable for the debt.

It has often been held that fraud practiced by the principal obligor in obtaining possession of a note upon which one is bound as surety, by inducing the payee to accept a note in lieu thereof that is a forgery, or, by other fraudulent means, to cancel the real security, will not release the surety, or destroy the validity of the

original obligation.   This, as an abstract legal proposition, cannot be questioned, and no judicial opinion has been cited to the contrary.

Neither the surety, nor any one else, should be allowed to assert rights or claim benefits derived through the fraud of others.   Such is the doctrine recognized in the cases of Gordon v. McCarty, 3 Wharton, 407; Lutterel v. Waltham, cited in 14 Ves., 290; Brooking v. Farmers' Bank, 83 Ky., 431 ; Stratton v. McMakin, 84 Ky., 641, and First Nat. Bank of Cov. v. Gains, 87 Ky., 597.

This court, in the case of Farmers and Drovers' Insurance Company v. The German Insurance Company, 79 Ky., 598, where the first mortgagee was induced to release his mortgage by the fraud of the debtor and accept a second mortgage for the same debt, upon the representation by the debtor that no other incumbrance had been created, held that although another mortgage had been executed and recorded between the date of the first and second mortgage to the appellee, that the fraud of the debtor, in which the intervening mortgagee in nowise participated, left the creditor, the first mortgagee, with a preferred lien, and equity would restore him to his former condition, and particularly as the appellant had not been injured, or his condition made worse by any act of the appellee.   A court of equity will always relieve against fraud as between the parties to the transaction, nor will others be permitted to reap the benefits of the fraud, however innocent, when their rights are not affected by granting the relief.

This is the principle on which the opinions referred to are based; and in the case, recently decided by

this court, of First National Bank of Covington v. Gains, 87 Ky., 597, where the names of the sureties had been forged to the renewal notes, it was said that such obligations being void, the remedy would be on the original obligation, to which the genuine signatures of the sureties had been affixed.

This would be equitable, and in accordance with common honesty and fair dealing. The sureties in that case were ignorant of the fact that the paper was being renewed, and the bank ignorant of the fact that the names to the renewal paper were forgeries. Now, it is plain that if the bank had been informed, or knew on the next day after the forgery had been practiced, that the names of the sureties were not genuine, and had failed, within a reasonable time, to have notified the sureties that it would look to their original obligation for the debt, they (the sureties) would have been released.

The question really involved in this case is not whether the fraud of the principal obligor, in obtaining the note, released the surety; but did the conduct and acts of the bank, after being informed of the fraud, release the surety from his undertaking? The parties to this controversy all live in the city of Louisville. The note on which the appellant was liable was canceled by the bank, taken up by the principal obligor, and delivered to or destroyed in the presence of the surety. There is nothing whatever in this case, except the relation between the parties, that tends to show that the surety had any knowledge as to the manner in which the debt had been satisfied, and no character of testimony showing that the surety acted in bad

faith, or had reason to believe that his brother had defrauded the bank; and with a knowledge by the creditor that the appellant was only the surety, and with the further knowledge that it had been defrauded, communicated to its chief officer on the day after the mortgage was executed; still the surety, with the paper canceled, was left by the bank to believe that the debt had been fully paid, and to indulge in this belief from the 15th or 16th of June, 1887, until this action was filed in November following, a period of near five months.

The question arising in such a state of case is not whether the surety in fact has been injured, but has the laches of the bank been such as would have deprived the surety of his right to protect himself if such circumstances existed as would have enabled him to do so. It must be recollected that the doctrine already announced, where the fraud or forgery has been committed by the principal, without any participation in the transaction by the surety, the latter is not released, is restricted by the further rule that if the transaction between the creditor and the principal debtor is such that causes loss to the surety, such as surrendering a security to which he is entitled, the surety is nevertheless released.

The surety stands upon the letter of his contract, and the chancellor will not start out in pursuit of equities that will relieve the creditor from an injudicious agreement in order to hold the surety bound for the debt.

A mistaken judgment by the bank caused a new agreement in this case to be made by its chief officers, by which the period for payment of a debt then due was extended for five years, and a mortgage on realty

taken to secure the payment, not only of the debt upon which the appellant was the surety, but of unsecured paper owing by the principal debtor to the bank. He was then on the eve of insolvency, and notified the bank of his purpose to make an assignment on the next day. The bank, after being advised, accepted a conveyance of the debtor's own land that it knew was constructively fraudulent, with a view of securing not only the debt in controversy, but other debts on which there was no security, and after knowledge of the fraud, and after lulling the surety into perfect security, so far as the present indebtedness is concerned, for near five months, then seeks the aid of a court of equity to relieve it from the fraud of the principal debtor. The opportunity of the surety to secure himself has been lost, and it is not necessary to inquire, under such circumstances, whether the surety could in fact have obtained indemnity.

If the solvency or insolvency of the principal is to control the question, then, by the same process of reasoning, if time is extended under a mistake of law or fact by the creditor as to his legal rights, if the debtor is or was insolvent, the surety is still bound, because the surety would have had the debt to pay if no extension had been given.

In Allen v. Sharpe, 37 Ind., 67, the valid note had been surrendered in lieu of a forged note, and within fifteen days the surety was given notice of the forgery. The defense was, that this notice was insufficient, and that the surety was released by the acceptance of the forged note. The court very properly held, that the acceptance of the forged note was not a payment, and

that the delay of fifteen days caused no injury to the
surety, because the principal was insolvent, the court
further remarking, "that if the surety had lost an
opportunity to save himself, there would have been
some reason for the defense ; but without such a show-
ing, the argument is destitute of force." The court
was addressing itself to the case in hand in using the
language quoted, and if the indorser of the paper in
that case, living in the same town or city with the
bank, had been informed that the note was canceled,
and, in fact, delivered up, and the bank, with a
knowledge of the fraud, had kept the surety in ignor-
ance of the fraud, or failed to give notice for such a
time as elapsed in this case after the fraud was discov-
ered, it is safe to assert that no court would have insti-
tuted the inquiry as to whether or not the principal
was insolvent, in order to hold the surety bound. The
creditor has no right to modify the terms of the contract
without the consent of the surety, and when induced to
do so by the fraud of the debtor, it is of the utmost
importance to notify the surety, who has been informed
that the contract has been altered, and he released, in
order that he may take steps to secure his liability. In
this case the surety, with notice, might have obtained
from the wife the security she had given the bank, for
although the husband had purchased it, he held in
equity for the wife, and although liens existed upon it,
the preponderance of the testimony shows that after
satisfying the liens there would have been as much as
two or three thousand dollars left to afford indemnity.
If the wife was willing to mortgage to the bank, and
the purpose was to secure her brother-in-law, why could

not the surety have accepted the mortgage? The bank, however, insisted on releasing all claim upon the mortgaged property, and asked the chancellor, in a suit against the assignee, to compel the assignee to accept the release, which he did. Now, whether fraudulent or not on the part of the debtor and his wife, the surety was entitled to all the indemnity the bank had obtained, and instead of releasing the mortgage, the bank should have called on the surety to accept the indemnity that the debtor was willing to give, and claims he executed in good faith.

The fraudulent grantors could not cancel the mortgage, and it was the duty of the bank, when repudiating the transaction, in so far as it released the surety, to hold on to the indemnity for his benefit, for the reason, as is urged by the bank, the mortgage was given for the benefit of the surety, and to release him from liability. In this both the bank and the fraudulent grantors concur.

Mr. Justice Story, in his work on Equity Jurisprudence, says: "Indeed, the proposition may be stated in a more general form, that if a creditor does any act injurious to the surety, or inconsistent with his rights, or if he omits to do any act, when required by the surety, which his duty enjoins him to do, and the omission proves injurious to the surety, in all such cases the latter will be discharged." (1 Story's Eq. Jur., § 325.)

In Sneed's Ex'r v. White, 3 J. J. Mar., 525, this court said: "Any settled agreement or active interference by the obligee, by which the surety may be injured or subjected to increased risk, or deprived of, or suspended in, the assertion of his equitable right to force the obligee

to sue his principal, or of his right to pay the debt and occupy the attitude in equity of the obligee, will release the surety in equity."

In Lohman v. Lohman, 74 Ind., 421, it was held, in effect, "that the agreement by the creditor to reloan the money to the principal on his own note, or to take the money due and surrender the note on which the surety was bound, was calculated to lull the surety into a sense of security, and to prevent him from obtaining indemnity, and in such a state of case absolve the surety from all liability." (See Carpenter v. King, 9 Met., Mass., 511 ; Baker v. Briggs, 8 Pick., 122 ; Woolley v. Louisville Banking Company, 81 Ky., 527 ; Brooking v. Farmers' Bank, 83 Ky., 431.)

In the case being considered, the bank, so far as the surety was concerned, never repudiated the agreement between it and the debtor, at least until suit was brought. There was no necessity for his seeking indemnity, because he saw the canceled paper on which his name appeared as surety, and knew that he was released. Here the parties were all *sui juris*. The records evidencing the title and the incumbrances on the land were in the same city, and while the reliance on the representations of the debtor would not prevent a recovery against the surety, when the bank had exonerated him from liability, and failed, within a reasonable time, to give him notice of the fraud, and, going further, had released the indemnity that is claimed by both of the parties to the transaction was for his benefit, he is in equity and good conscience released from liability.

Judgment reversed, and remanded with directions, in so far as the surety is concerned, to dismiss the petition.

To a petition for rehearing, filed by counsel for appellee, Judge Pryor delivered the following response of the court:

In the case of Gordon v. McCarty, 3 Wharton, 407, the action was on a bond given in the Orphans' Court for the distributable share of one of the distributees of the proceeds of real estate. The distributee could neither read nor write, and the obligee obtained a release from her, that, if valid, discharged the surety. The defense to the release in that case was, that the writing was not, in fact, the act of the distributee, and an action within ten years could be maintained against the surety for the recovery of the money in the hands of the obligor.

That case is unlike the one before us. Here, an ordinary business transaction with a bank, where one being the indorser or the surety for the loan of money, is released by cancelling the note; it was, in fact, destroyed, a new note executed, with the payments extended for a long period, and a mortgage given and recorded to secure its payment. Not only so, the mortgage was executed to secure other claims upon which the surety was not liable. It turned out that liens existed on the mortgaged property, and the obligor had made false representations in regard to that fact and the character of the title. The fraud was known to the bank on the next day after the mortgage was executed, and the bank permitted the surety to remain in ignorance of its purpose to hold him liable on the original obligation for five months, when the surety lived in the same city, and was well known to the officers of the bank. Under such circumstances, this, of

itself, would *release the surety. The security given was accepted by the bank, and held during this entire period, when finally, without the consent of the surety, the mortgage was canceled, at the instance of the bank, when it knew that the purpose of its execution was to release the surety. No court of equity would hold the surety liable, under such a state of facts; nor will the inquiry (the facts being conceded) be made as to whether or not the surety, in the interval, could have secured himself, if notified of the fraud, as the bank was the day after it was perpetrated.

This court does not mean to hold that a lapse of five months from the commission of the wrong, without notice to the surety, would, in every case, release the surety; but, under the circumstances of this case, no liability on his part exists.

Petition overruled.