## Elsey v. Peoples Bank of Bardwell.

(Decided October 26, 1915.)

### Appeal from Carlisle Circuit Court.

1. Principal and Surety—Indulgence—Discharge of Surety.—Any act of the creditor which entitles the obligor to indulgence, after the debt shall have become due according to the terms of the original contract, will, in equity, discharge the surety who has not consented to the indulgence, and his consent cannot be inferred from his silence, or neutrality, but must be evinced by some positive act.

2. Principal and Surety—Discharge of Surety.—The surrender of collateral security by the creditor to the principal debtor without the consent of the surety, discharges the surety, and it is not material whether the collateral so surrendered was sufficient to discharge the whole debt or not.

3. Principal and Surety—Creditors.—The surety stands by the letter of his contract, and the chancellor will not start out in pursuit of equities that will relieve the creditor from an injudicious agreement in order to hold the surety bound for the debt.

4. Trial—Submission of Controversy.—It is improper to submit to the jury an issue upon which there is no proof.

5. Banks and Banking.—Where a bank, in violation of section 581 of the Kentucky Statutes, took its own capital stock as security for a loan, and the contract has been executed and the stock dis-

posed of, the prohibition against the validity of the transaction can only be urged by the State, and, both parties being equally the subjects of legal censure, they will be left by the court where they have placed themselves.

JOHN E. KANE for appellant.

T. M. COLLINS and ROBBINS & ROBBINS for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE MILLER.— Reversing.

In 1906 A. G. Elsey bought five shares of the capital stock of the Peoples Bank of Bardwell for $725.00

For the purpose of raising the money to pay for the stock, A. G. Elsey executed his note to the Peoples Bank for $750.00, and attached the certificate for the five shares to his note as collateral security therefor, and had his brother, the appellant J. L. Elsey, sign the note as surety. J. L. Elsey refused to sign the note unless his brother would pledge the five shares to the bank as collateral security on the note; and that was done. The loan was made by Bodkin, the president of the bank.

The note was renewed several times by the same parties, and reduced from time to time until the final renewal on July 11th, 1907, when the note amounted to $540.00. It was again renewed in the same way, for twelve months, and the five shares of bank stock which had been attached to the previous renewals, was again attached to this last renewal, as collateral security.

Some time during the year 1909, A. G. Elsey, without the knowledge of J. L. Elsey, persuaded Young, the cashier of the Peoples Bank, to surrender to A. G. Elsey the stock certificate, thus leaving the note with no security except J. L. Elsey, and depriving him of the protection of the bank stock as collateral. A. G. Elsey pledged the stock certificate to a bank at Cairo, Illinois, as collateral for $750.00, which he borrowed from that bank.

When A. G. Elsey's note to the Cairo bank matured, he sold the bank stock to another brother, A. F. Elsey, and applied the proceeds to the payment of his note for $750.00 due the Cairo bank.

During this time the Peoples Bank was indebted to the Alexander County National Bank at Cairo, and had pledged the note of A. G. Elsey and J. L. Elsey for $540.00, above mentioned, as collateral security for its indebtedness to the Alexander County National Bank.

When the note was returned by the latter bank to the Peoples Bank, and J. L. Elsey was called upon to renew it, he found that the stock certificate had been surrendered by the Peoples Bank three years or more before, and he refused to renew the note for that reason. As a consequence of that refusal, this suit on the note was filed on November 8th, 1913, by the Peoples Bank against A. G. Elsey and J. L. Elsey.

Six months later—on May 11th, 1914—the Peoples Bank was declared insolvent, and was placed in the hands of the State Banking Commissioner, who proceeded to liquidate its affairs. By order of court he was made a party plaintiff in this action.

A. G. Elsey did not answer; but, by his separate answer, J. L. Elsey alleged his suretyship upon the note sued on; that he had been released from liability thereon by reason of the plaintiff's surrender of the stock certificate which it held as collateral security to secure the payment of the note, without his knowledge or consent; and, that the bank stock was worth $165.00 per share.

The first paragraph of the reply traversed the allegations of the answer, except the allegation of suretyship upon the part of J. L. Elsey.

The second paragraph of the reply alleged that J. L. Elsey bought the stock from A. G. Elsey after he had received it from the bank, and sold it to another brother, A. F. Elsey; that J. L. Elsey applied the proceeds from the sale to the payment of the joint liabilities of himself and his co-defendant A. G. Elsey, and that he thereby received the full benefit of the value of the five shares of stock.

The third paragraph of the reply alleged that A. G. Elsey was a stockholder in the Peoples Bank, and that after the note had been signed, A. G. Elsey attached the stock to the note; that this arrangement was made between the defendants A. G. Elsey and J. L. Elsey without the plaintiff requiring the same to be done; and, that under section 581 of the Kentucky Statutes, the plaintiff was without authority to take its capital stock as collateral security for the loan, evidenced by the note sued on.

By a fourth paragraph of the reply, the plaintiff alleged that it was insolvent at the time the note was executed and delivered to it in 1906; that on account of bad loans and mismanagement, the value of its stock was

greatly impaired, and that it was virtually worthless; that the bank was placed in the hands of the Banking Commissioner, as above recited; that for the purpose of paying its depositors and other liabilities, it would be necessary to enforce the statutory double liability of the stockholders; and that by reason of these facts the stock was worthless at the time it was pledged to the plaintiff.

A general demurrer to the second paragraph of the reply was overruled, but a like demurrer to the third and fourth paragraphs was sustained.

By an amended reply, the plaintiff enlarged the third paragraph of its original reply by alleging that J. L. Elsey was a director in the Peoples Bank at the time A. G. Elsey sold and transferred the bank stock to A. F. Elsey on the books of the bank, and J. L. Elsey knew, or by the use of ordinary care could have known, that A. G. Elsey was about to have said stock transferred to A. F. Elsey, who was then the president of the plaintiff, and that J. L. Elsey assented to the same; and that the transfer was made by and through the collusion of the defendants A. G. Elsey, J. L. Elsey and A. F. Elsey, to defraud the plaintiff.

It further amended the fourth paragraph of the original reply, by alleging that J. L. Elsey was a director, and A. F. Elsey was president of the plaintiff bank at the time the note sued on was executed; that the defendant J. L. Elsey knew, or by the exercise of ordinary diligence could have known, that A. G. Elsey was about to have said stock transferred on the books of the bank to A. F. Elsey; and, that when the transfer was made, J. L. Elsey was a stockholder and director of the plaintiff, and assented thereto.

The allegations of the amended reply were controverted of record.

A trial with the aid of a jury resulted in a verdict and judgment for the bank, and J. L. Elsey appeals.

1. Appellant first insists that his motion for a directed verdict in his favor should have been sustained, because there was no proof even tending to show that he had ever consented to the surrender of the bank stock, but, on the contrary, that the only proof upon that subject was to the effect that he not only did not consent to the surrender of the bank stock, but disavowed it, and refused to pay the note and claimed his release as surety,

thereon immediately upon learning of the surrender of the stock.

Young, the cashier and manager of the bank, testified that in 1909 he turned over the bank stock to A. G. Elsey, at his request, and that J. L. Elsey was not present.

The only other proof relating to this specific transaction is that of J. L. Elsey, who swears that he did not know the bank stock had been surrendered until the note was presented to him for renewal, and that he declined to renew it and claimed his release because the collateral had been surrendered.

The question as to what act of the creditor will discharge the surety, was carefully and ably considered by Chief Justice Robertson in the early case of Sneed's Exor. v. White, 3 J. J. M., 525; 20 Am. Dec., 175, where, speaking in general terms, he stated the rule as follows:

"Any act of the creditor, which entitles the principal obligor to indulgence, after the debt shall have become due, according to the terms of the original contract, will, in equity, discharge a surety who has not consented to the indulgence; and his consent can not be inferred from his silence, or neutrality; but must be evinced by some positive act.

"This principle of equity is undeniably established by abundant authorities. And it is just and rational. The creditor should not be allowed, by any act of his, or by any new contract with the principal debtor, without the concurrence of his surety, to modify the original contract; affect the rights or change the attitudes and relations of the parties."

In that case Sneed had caused an execution to be levied upon the property of Pearson, the principal debtor, and by Sneed's order the sheriff stayed the execution for a few days, without the consent of White, who was Pearson's surety. In applying the general rule above set forth, to the facts of that case, Chief Justice Robertson further said:

"A stay of execution by the creditor, after the levy of it on the property of the principal debtor, will exonerate his surety, if the lien resulting from a levy be extinguished and the surety did not approve the indulgence. This is in perfect accord with the general principle which has been defined. For, by releasing the property levied on, from the lien, the creditor increases the risk of the surety. It is not material whether the property so ex-

empted was sufficient to discharge the whole debt or not. It is the fact that the creditor interfered, and thereby increased the risk of the surety, and not the extent of injury resulting from his act, which will relieve the surety from his liability in equity. To make the right to relief depend on the degree of injury, would, in the language of Loughborough, in Rees v. Barrington, 'lead to a vast variety of speculations upon which no sound principle could be built.' "

The principle announced in Sneed's Exor. v. White, *supra,* has been approved and followed by this court in a long and unbroken line of decisions.

See Sparks v. Hall, 4 J. J. M., 36; Ross v. Clore, 3 Dana, 189; Tudor v. Goodloe, 1 B. M., 323; Dills v. Cecil, 4 Bush, 579; Preston v. Henning, 6 Bush, 556; Calloway v. Snapp, 78 Ky., 563; Struss v. Masonic Savings Bank, 89 Ky., 61; Gano v. Farmers Bank, 103 Ky., 508; Mayes v. Lane, 116 Ky., 566; Broughton v. Saylor, 129 Ky., 185.

In Struss v. Masonic Savings Bank, *supra,* the principal debtor procured the bank to surrender a note upon which his brother was surety, by giving a mortgage to the bank upon property which he fraudulently represented was free from incumbrances when in reality, it was heavily mortgaged.

After the discovery of the fraud by the bank it waited five months and then surrendered the note, released the mortgage, and sued to cancel the fraudulent transaction and hold the surety for the debt.

In holding that the surety was released, Judge Pryor, in speaking for the court, said:

"The question arising in such a state of case is not whether the surety in fact has been injured, but has the laches of the bank been such as would have deprived the surety of his right to protect himself if such circumstances existed as would have enabled him to do so. It must be recollected that the doctrine already announced, where the fraud or forgery has been committed by the principal, without any participation in the transaction by the surety, the latter is not released, is restricted by the further rule that if the transaction between the creditor and the principal debtor is such that causes loss to the surety, such as surrendering a security to which he is entitled, the surety is nevertheless released.

"The surety stands upon the letter of his contract, and the chancellor will not start out in pursuit of equities

that will relieve the creditor from an injudicious agreement in order to hold the surety bond for the debt.

"A mistaken judgment by the bank caused a new agreement in this case to be made by its chief officers, by which the period for payment of a debt then due was extended for five years, and a mortgage on realty taken to secure the payment, not only of the debt upon which the appellant was the surety, but of unsecured paper owing by the principal debtor to the bank. He was then on the eve of insolvency, and notified the bank of his purpose to make an assignment on the next day. The bank, after being advised, accepted a conveyance of the debtor's own land that it knew was constructively fraudulent, with a view of securing not only the debt in controversy, but other debts on which there was no security, and after knowledge of the fraud, and after lulling the surety into perfect security, so far as the present indebtedness is concerned, for near five months, then seeks the aid of a court of equity to relieve it from the fraud of the principal debtor. The opportunity of the surety to secure himself has been lost, and it is not necessary to inquire, under such circumstances, whether the surety could in fact have obtained indemnity."

The rule above announced is carried even further by some of the states, including Kentucky, Pennsylvania and Delaware, which hold that a general deposit of the principal in a bank holding his note, with an endorser or surety thereon, is a means of satisfaction or a security in its hands, which the creditor bank must hold and apply to the payment of the note, on pain of releasing the surety or endorser; thus holding that to permit the withdrawal of the funds of the principal on general deposit at the maturity of the note, is in practical effect, the same thing as surrendering to the principal a collateral security for the debt, and effects a discharge of the surety. Bank of Taylorsville v. Hardesty, 28 Ky. L. R., 1285, 91 S. W., 729; Pursifull v. Pineville Banking Co., 97 Ky., 154, 53 Am. St. Rep., 409; Faulkner v. Cumberland Valley Bank, 14 Ky. L. R., 923; Fordsville Banking Co. v. Thompson, 26 Ky. L. R., 534, 82 S. W., 251; Burgess v. Deposit Bank of Sadieville, 30 Ky. L. R., 178; Planters State Bank v. Schlamp, 124 Ky., 295.

2. In some jurisdictions, however, where the creditor surrenders possession of a collateral security, he must account for it, and the surety is released *pro tanto,* only.

But in this jurisdiction the surety is released from all liability, it being immaterial whether the property was sufficient to discharge the whole debt or not.

It is the fact that the creditor interfered and thereby increased the risk of the surety and deprived him of his right of subrogation, and not the extent of injury resulting from his act, that relieves the surety. This is the effect of the Kentucky cases, beginning with Sneed's Exor. v. White, *supra*.

In Royster v. Heck, 14 Ky. L. R., 267, before the Superior Court, the bank released to Royster, the principal debtor, certain of his property, "more than enough in value to pay off and discharge in full all of his liabilities," upon which property it had a lien, in consideration of Royster's conveying to the bank certain other property.

The court said:

"Did the contract release Heck as surety on the notes? Of this there can be no question. The bank had a lien upon the land released to Royster and a creditor is not entitled to relinquish any hold which he has actually acquired on the property of the principal, which might have been made effectual for the payment of the debt, nor must he deal with the debtor or the security which he holds upon the debtor's property to the prejudice of the surety, unless he intends to release him from further liability.

"There is no better settled principle of law than that when two persons are respectively liable to the creditor for the same debt, one as principal and the other as surety, an absolute release of the principal releases the surety.

"In many of the states the surety is released *pro tanto* or entirely, according to the value of the security released, but in this State any agreement or active interference by an obligee, whereby the surety may (be) injured, releases him absolutely and it is not material whether the property so exempted was sufficient to discharge the whole debt or not. This was held in Sneed's Exors. v. White, 3 J. J. M., 525, and has been followed by the Court of Appeals and this court since that time."

A petition for a rehearing having been filed, calling the court's attention to the fact that it had misquoted the record in saying that the surrendered property was

more than sufficient to pay the debt, Judge Barbour delivered the following response:

"The court, in its former opinion, did not quote the answer correctly in saying that it was there alleged that the property surrendered by the bank to Royster was sufficient to pay the debt. That, however, is not material.

"The answer does allege that, by the terms of the agreement, Royster himself and his property were released and discharged from liability on the bank debt.

"It matters not what amount or property was released, as was held by the Court of Appeals in the case cited in the opinion. Either the discharge of Royster or any part of his property from liability released the surety. Petition overruled."

The apparent inconsistency in some of the expressions of this court which say the surety is released where the creditor releases property of the principal "sufficient in value to pay the debt," or some equivalent expression which might be construed to mean that the surety would be released *pro tanto* only in case the released property was of less value than the debt, are, in reality, strictly in line with the rule above stated, when read in connection with the pleadings in those cases. Since the surety would be released in either case—whether the released property was sufficient or insufficient to pay the debt—the pleader would naturally use the broader term relating to the released property; and, the court in discussing the case would follow the language of the answer. But in every case it was held that the release was a full and not merely a *pro tanto* release of the surety.

It appears, therefore, that J. L. Elsey's position as surety having been changed without his consent, he was relieved of all liability upon the note sued on.

Plaintiff insists, however, that the general rule above announced should not be applied in this case, because appellant was a director in the Peoples Bank from 1908 until its close in May, 1914; that during most of that time he was clerk of the directors' meetings; that A. F. Elsey was director and president of the bank from 1908 to its close; and, that A. G. Elsey was a director in the bank from July, 1907, to July, 1908.

In view, however, of the facts as above stated, we do not see how the relationship of J. L. Elsey, or his brothers, to the bank, could revive the liability of J. L. Elsey, after he had been once released by the surrender of the

collateral without his knowledge or consent. It may have been true that, by the exercise of ordinary care, J. L. Elsey could have ascertained that the collateral had been surrendered; but it was the surrender of the collateral by Young, without J. L. Elsey's knowledge or consent, that operated to release him. Upon the evidence before us, therefore, the appellant's motion for a peremptory instruction should have been sustained.

The second instruction directed the jury, in case it believed that the five shares of bank stock had been surrendered by the bank without the knowledge or consent of J. L. Elsey, it should credit J. L. Elsey's liability on the note sued on with the actual value of the stock at the time of its surrender.

Appellee would sustain the instruction upon the idea that the stock was really worthless when surrendered in 1909. That is doubtless true. But it had a market value during all those years; and, even down to the time immediately before its suspension in May, 1914, the stock was selling on the market at from $120.00 to $160.00 per share. But, under our view of the case, any instruction relating to the value of the stock and directing a credit upon the note sued on for the value of the collateral was improper, since J. L. Elsey was entitled to no credit therefor in case he consented to its surrender, and he was wholly relieved in case he did not so consent.

3. It is further objected that the third instruction told the jury that if they believed from the evidence that J. L. Elsey subsequently bought these shares of bank stock from A. G. Elsey and sold the same to A. F. Elsey, and that the proceeds of said sale were applied to the satisfaction of J. L. Elsey's liability, or that if J. L. Elsey assented to the transfer of said bank stock from A. G. Elsey, or that J. L. Elsey knew that A. G. Elsey was about to transfer said stock, and the defendant J. L. Elsey assented thereto, the law was for the plaintiff.

The ground of the objection to this instruction is that there is no proof to sustain it, and as the objection was well taken, the instruction should not have been given.

The same criticism applies to instruction "F," upon the charge of fraud.

4. The circuit court properly sustained the demurrer to the third paragraph of the reply, by which the bank sought to avoid its liability for surrendering the collateral, by alleging that the bank was without authority,

under section 581 of the Kentucky Statutes, to accept its own stock as collateral security for a loan made by it.

It is true that section 581, *supra,* provides that no bank shall take as security for any loan or discount any part of its capital stock. This section of our statute is a substantial copy of section 5201 of the Revised Statutes of the United States, enacted by Congress for the regulation of national banks; and under said section 5201, it was held in First National Bank of Xenia v. Stewart, 107 U. S., 676, that after the contract has been executed and the stock disposed of, the prohibition against the validity of the transaction could only be urged by the government; and, that both parties being equally the subjects of legal censure, they will be left by the court where they have placed themselves.

See also Bank v. Matthews, 98 U. S., 621, and Bank v. Whitney, 103 U. S., 99.

Judgment reversed for further proceedings consistent with this opinion.